Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued March 29, 2004        Decided July 6, 2004

No. 03-1118

SBC COMMUNICATIONS INC.,
PETITIONER

v.

FEDERAL COMMUNICATIONS COMMISSION AND
UNITED STATES OF AMERICA,
RESPONDENTS

CORECOMM COMMUNICATIONS, INC. AND
Z–TEL COMMUNICATIONS, INC.,
INTERVENORS

On Petition for Review of an Order of the
Federal Communications Commission

*Michael K. Kellogg* argued the cause for petitioner. With him on the briefs were *Colin S. Stretch*, *James D. Ellis*, and *Gary L. Phillips*.

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

*Richard K. Welch*, Counsel, Federal Communications Commission, argued the cause for respondents. With him on the brief were *Robert H. Pate III*, Assistant Attorney General, U.S. Department of Justice, *Catherine G. O'Sullivan* and *Steven J. Mintz*, Attorneys, *John A. Rogovin*, General Counsel, Federal Communications Commission, *John E. Ingle*, Deputy Associate General Counsel, and *Rodger D. Citron* and *Suzanne M. Tetreault*, Counsel. *Nancy C. Garrison*, Attorney, U.S. Department of Justice, entered an appearance.

*Glenn B. Manishin* argued the cause for intervenors. With him on the brief was *Stephanie A. Joyce*.

Before: Sentelle, Rogers and Tatel, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* Sentelle.

Sentelle, *Circuit Judge*: SBC Communications, Inc. ("SBC") brings this petition for review challenging a $6 million forfeiture levied against it by the Federal Communications Commission ("FCC"). The FCC issued the fine because, it claims, SBC flagrantly violated the terms of an FCC-approved merger agreement to which SBC is a party. SBC's primary complaint is that the forfeiture order violates the Fifth Amendment's due process clause, because SBC was not on "fair notice" of the duties under the merger agreement that the FCC accuses it of shirking. SBC also argues that the order is arbitrary and capricious. Because both of these challenges are without merit, we deny the petition for review.

## I. Background

### A. Unbundling under the Telecommunications Act

SBC's petition concerns its obligations as an incumbent local exchange carrier ("ILEC") under the Telecommunications Act. ILECs are companies that own the local wires that connect telephone subscribers' phones to local phone company exchanges. ILECs also own the local exchanges. Those exchanges centrally route calls, using switches, among the local phone wires and the trunks that connect various exchanges, obviating the need for each phone to be connected to one other. To prevent ILECs from monopolizing these facilities, the Telecommunications Act ("the Act"), as amend-

ed in 1996, requires ILECs to allow competing carriers, known as competitive local exchange carriers ("CLECs"), to use their networks, a practice known as "unbundling." In particular, the Act requires ILECs to allow CLECs to lease "unbundled network elements" ("UNEs") so that CLECs can offer service in competition with ILECs. *See* 47 U.S.C. § 251(c)(3).

The task of determining those network elements that must be unbundled is delegated to the FCC. In determining whether a network element should be unbundled, the Act requires the FCC to consider "at a minimum" whether "access to such network elements as are proprietary in nature is necessary" and whether "the failure to provide access to such network elements would impair the ability of the telecommunications carrier seeking access to provide the services that it seeks to offer." *Id.* § 251(d)(2). The FCC has issued a series of orders addressing the scope of ILECs' obligation to unbundle their network elements.[1]

"Network element[s]" that must be unbundled include the "functions[ ] and capabilities" provided by ILECs' network facilities. *Id.* § 153(29). One such capability is the service of transporting telephone calls on an ILEC's network; it seems fairly clear that this service is therefore a network element. *See S.W. Bell Tel. Co. v. FCC*, 199 F.3d 996, 997 (8th Cir. 1999) (per curiam). Such transportation is accomplished using transport lines that connect the exchanges and switches in the network. ILECs' networks transport calls either by dedicating those transport facilities to a single carrier, which are referred to as "dedicated transport" facilities, or by allowing several carriers to share the facilities, referred to as "shared transport" facilities. SBC's petition for review in-

---

[1] *Triennial Review Order*, 18 FCC Rcd 16978 (2003), *vacated in part*, *U.S. Telecom Ass'n v. FCC*, 359 F.3d 554 (D.C. Cir. 2004); *UNE Remand Order*, 15 FCC Rcd 3696 (1999), *clarified*, 15 FCC Rcd 9587 (2000), *petitions for review denied*, *Competitive Telecomms. Ass'n v. FCC*, 309 F.3d 8 (D.C. Cir. 2002); *Shared Transport Order*, 12 FCC Rcd 12460 (1997), *vacated in part*, *S.W. Bell Tel. Co. v. FCC*, 199 F.3d 996 (8th Cir. 1999) (per curiam); *Local Competition Order*, 11 FCC Rcd 15499 (1996) (subsequent history omitted).

volves its obligation to provide CLECs with unbundled access to its shared transport facilities.

## B. The Merger Order

For purposes of the present petition, the FCC does not claim that SBC's obligation to provide shared transport arises directly from the unbundling provisions of the Act. The FCC claims instead that the obligation arose from an order it issued that conditionally approved a merger between SBC and Ameritech, Inc., another ILEC. *See In re Applications of Ameritech Corp. and SBC Communications, Inc.*, 14 FCC Rcd 14712 (1999), *vacated in part on other grounds*, *Ass'n of Communications Entrs. v. FCC*, 235 F.3d 662 (D.C. Cir. 2001) ("*Merger Order*"). As both Ameritech and SBC held FCC licenses, the FCC was authorized to approve the merger only if it found that "the public interest, convenience and necessity [would have been] served" by it. 47 U.S.C. § 310(d). On that question, the FCC took the position that the merger would have anticompetitive effects not outweighed by its benefits and therefore was not in the public interest. Accordingly, the parties engaged in extensive negotiations so that they could "explore the possibility of [SBC and Ameritech] strengthening their application by agreeing to certain voluntary public interest commitments." *Merger Order* ¶ 43.

Those negotiations resulted in a series of conditions on the merger of the two companies, issued by the FCC October 8, 1999. One of the conditions required the merged entity (which, for convenience, we simply call "SBC" unless the context shows otherwise) to provide shared transport to CLECs in the states formerly served by Ameritech. That condition specifically provided:

> Within 12 months of the Merger Closing Date (but subject to state commission approval and the terms of any future Commission orders regarding the obligation to provide unbundled local switching and shared transport), SBC/Ameritech shall offer shared transport in the SBC/Ameritech Service Area within the Ameritech States under terms and conditions, other than rate struc-

> ture and price, that are substantially similar to (or more favorable than) the most favorable terms SBC/Ameritech offers to telecommunications carriers in Texas as of August 27, 1999. Subject to state commission approval and the terms of any future Commission orders regarding the obligation to provide unbundled local switching and shared transport, SBC/Ameritech shall continue to make this offer, at a minimum, until the earlier of (i) the date the Commission issues a final order in its UNE remand proceeding . . . finding that shared transport is not required to be provided by SBC/Ameritech in the relevant geographic area, or (ii) the date of a final, non-appealable judicial decision providing that shared transport is not required to be provided by SBC/Ameritech in the relevant geographical area.

*Merger Order*, App. C ¶ 56. The FCC explained that paragraph 56 "obligates Ameritech to provide shared transport until a final order of the Commission or a final and non-appealable judicial decision determines that SBC/Ameritech is not required to provide shared transport in all or a portion of its operating territory." *Merger Order* ¶ 396. "Shared transport," the conditions defined, meant "the function of shared transport" as defined in a previous FCC order. *Id.* App. C ¶ 55.

The apparent reason for imposing this obligation to provide shared transport in the former Ameritech states–Illinois, Indiana, Michigan, Ohio, and Wisconsin–was to address Ameritech's prior reluctance to offer unbundled access to shared transport services. SBC, in contrast, had previously provided CLECs with access to such service, for example, in Texas; hence, the merger agreement defined the merged entity's obligation to provide such service by reference to a state SBC already had served.

C. The UNE Remand Proceeding and the Clarification Order

Two references in paragraph 56 of the merger conditions warrant further explanation. First, paragraph 56 refers to the UNE remand proceeding, which was an ongoing FCC

proceeding that was reconsidering, among other things, its unbundling rules. The FCC commenced that proceeding in response to the Supreme Court's January 1999 decision that had held unlawful in substantial part those initial rules. *See AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 387–92 (1999). The initial rules had broadly ordered ILECs to provide CLECs with unbundled access to network elements, including shared transport. *E.g.*, *Local Competition Order*, 11 FCC Rcd 15499 ¶ 440. But the rules, the Court had held, rested on an unreasonable and overly broad construction of when not having access to network elements would "impair" CLECs. *Iowa Utils. Bd.*, 525 U.S. at 387.

In response to *Iowa Utilities Board*, the FCC issued its order in the UNE remand proceeding on November 5, 1999, about a month after the merger order issued. That proceeding concluded that an ILEC should, as a general matter, provide a CLEC with shared-transport services if the ILEC provides the CLEC with unbundled switching. *UNE Remand Order* ¶¶ 369–79. The order also concluded that "as a general matter" ILECs were required to unbundle "local circuit switching." *Id.* ¶ 253. Several ILECs and CLECs petitioned for clarification of the *UNE Remand Order*. The FCC issued a clarification in response. *Clarification Order*, 15 FCC Rcd 9587 (2000), *petitions for review denied*, *Competitive Telecomms. Ass'n v. FCC*, 309 F.3d 8 (D.C. Cir. 2002).

As relevant to the present case, the clarification addressed the proper methodology for analyzing whether an ILEC must unbundle exchange-access service, assuming it was also required to unbundle local-exchange service. *Id.* ¶¶ 13–14. "Exchange access service" is the process of originating and terminating calls on the ILEC's network, i.e., providing "access" to the users physically connected to the ILEC's local loops and switches, so that they may send and receive calls to and from other networks. "Local exchange service," in contrast, is simply the practice of providing local telephone service to customers using the ILEC's local network.

The core of the methodology the FCC outlined was that each of these services, even though they both employ the

same physical facilities owned by the ILEC, needed to be analyzed separately, service by service, for purposes of determining whether the ILEC had to unbundle each of them. The FCC noted that the Act explicitly distinguishes the markets for the two services. *Id.* ¶ 14. (Again, under the Act, whether a given network element must be unbundled depends, in part, on whether the CLEC would be "impair[ed]" absent access to the network element. 47 U.S.C. § 251(d)(2).) Therefore, the Commission reasoned, a finding that CLECs would be "impaired" absent access to one of these markets did not mean "for that reason alone, and without further inquiry" that the CLEC would be "impaired" absent access to another of these markets, even though both exchange-access service and local-exchange service use the same physical facilities. *Clarification* ¶ 14. In other words, unbundling local-exchange service did not necessarily mean that exchange-access service should also be unbundled. The Commission's task, it explained, instead should be to resolve "whether the markets for local exchange service and special access are so closely interrelated from an economic and technological perspective that a showing of impairment with respect to the former market would by itself tend to suggest, as a practical matter, that the 'impair' standard is satisfied with respect to the latter market." *Id.* ¶ 16. The Commission did not in the clarification, however, resolve whether local-exchange-service unbundling should be tied to exchange-access-service unbundling; it merely stated its intention to do so in a future rulemaking using the methodology it had described.

The Commission also noted, more generally, that this market-specific "impairment" analysis outlined in the clarification was a departure from the analysis it had employed in its initial set of unbundling rules. "Before the Supreme Court issued its decision in *Iowa Utility Board*," the Commission explained, "we sometimes approached an incumbent's obligation to unbundle network elements as though it were an all-or-nothing proposition, suggesting that, if a competitor were entitled to obtain access to an element for one purpose, it was generally also entitled to obtain access to that element for

wholly different purposes as well." *Id.* ¶ 12. "Now that the Supreme Court has rejected our previous interpretation of that provision as insufficiently rigorous," it continued, "it is appropriate for us to revisit the issue." *Id.* The new methodology described by the Commission was the result of that revisiting. On petition for review, this Court held that the Commission's new methodology was a reasonable interpretation of the Act. *Competitive Telecomms. Ass'n v. FCC*, 309 F.3d 8, 12–13 (D.C. Cir. 2002).

D. SBC/Ameritech's Service in Texas as of August 27, 1999

The second reference in paragraph 56 that requires additional explanation is its allusion to the service that SBC/Ameritech was "offer[ing]" in Texas as of August 27, 1999. Again, that paragraph required SBC to "offer shared transport in the SBC/Ameritech Service Area within the Ameritech States under terms and conditions . . . that are substantially similar to (or more favorable than) the most favorable terms SBC/Ameritech offers to telecommunications carriers in Texas as of August 27, 1999." *Merger Order*, App. C ¶ 56.

The scope of SBC's "offer[ings]" as of that date is complicated by a dispute in which it was embroiled at the time with the Texas Public Utility Commission. The dispute was over the scope of its contractual obligation to provide shared transport to two CLECs, Sage Telecom and Birch Telecom of Texas, Ltd. *See Notice of Apparent Liability for Forfeiture*, 17 FCC Rcd 1397 ¶ 9 (2002) ("*NAL*"). In particular, the disagreement concerned SBC's contractual duty to provide the two CLECs shared-transport service for intra-Local Access and Transport Area ("LATA") toll calls. LATAs are service areas within which, but not beyond, the Bell operating companies–one of the operating companies divested from AT&T in the early 1980s as a result of antitrust litigation–were authorized to provide telephone service under the decree that the litigation produced. At the beginning of 1999, SBC had been providing such service to Sage and Birch under agreements with those companies. *Id.* However, SBC interpreted its agreement with Sage and Birch to authorize

SBC to stop providing such service (for reasons not relevant here), and announced that it intended to do so.

Sage and Birch disagreed with SBC and in April complained to the Texas Public Utility Commission. That same month, a panel of Texas PUC arbiters temporarily enjoined SBC from carrying out its plan to stop providing shared-transport service for intraLATA toll calls to Sage and Birch, pending its resolution of the dispute. This injunction was upheld in November 1999 (about a month after the issuance of the merger order) when the arbitration panel ruled that SBC's agreements with Sage and Birch required SBC to provide them with shared-transport service for intraLATA toll calls. *NAL* ¶ 11. The full Texas PUC affirmed the arbitration panel's decision the next month. *Id.*

E. The Administrative Proceedings Below

After the October 1999 merger order issued, SBC decided to offer shared transport in the states that Ameritech had formerly served–Illinois, Indiana, Michigan, Ohio, and Wisconsin–only for local-exchange service, not for intraLATA toll service. SBC, both in its submissions below and in its briefs, sees a significant difference between providing intraLATA shared-transport toll service and providing local shared-transport service. The market for intraLATA toll service, unlike the market for local phone service, SBC claims, is "competitive," though it does not state precisely how competitive it believes that market is, much less whether that degree of competition is in the public interest. As ILECs generally lack significant market power (i.e., the ability to price above cost) in that market, the argument goes, there is no warrant for a regulatory requirement for them to provide shared-transport service in such markets to CLECs.

The FCC, however, took the position that paragraph 56 of the merger conditions required SBC to offer such service in the five former Ameritech states. Because SBC had been providing, pursuant to the interim order of the Texas PUC arbitration panel, intraLATA shared-transport service in Texas as of August 27, 1999, the FCC concluded that SBC's failure to provide such service in the former Ameritech states

violated paragraph 56 of the merger conditions and issued a Notice of Apparent Liability for Forfeiture to that effect in January 2002. *See NAL* ¶¶ 12–19. The Commission is authorized to impose such forfeitures under 47 U.S.C. § 503(b) for willful or repeated failures to comply substantially with the terms and conditions of any license or other instrument issued by the Commission. The Notice proposed a forfeiture amount of $6 million. *Id.* ¶ 22. For substantially the same reasons outlined in the Notice of Apparent Liability, the Commission in October 2002 issued an order assessing a $6 million forfeiture on SBC, the statutory maximum $1.2 million fine per each continuing violation of paragraph 56, *see* 47 U.S.C. § 503(b)(2)(B), one for each former Ameritech state. *Forfeiture Order*, 17 FCC Rcd 19923 ¶¶ 22–27 (2002).

In April 2003, SBC paid the $6 million forfeiture and petitioned this Court for review of the FCC's forfeiture order. We have jurisdiction over the petition pursuant to 47 U.S.C. § 402(a). *See AT&T Corp. v. FCC*, 323 F.3d 1081, 1083–85 (D.C. Cir. 2003).

## II.  Analysis

SBC raises two challenges to the forfeiture order. SBC first argues that it was not on "fair notice" that paragraph 56 of the merger conditions obligated it to provide shared-transport service for intraLATA toll calls in the former Ameritech states, and therefore that the forfeiture infringed its due process rights. SBC's second argument is that the FCC imposed the fine in arbitrary-and-capricious fashion. Both arguments fail.

### A.  Fair–Notice Claim

The first issue we address is whether the merger conditions allowed SBC "to identify, with ascertainable certainty, the standards with which the agency expect[ed] [SBC] to conform," *Trinity Broad. v. FCC*, 211 F.3d 618, 628 (D.C. Cir. 2000) (quoting *General Electric Co. v. EPA*, 53 F.3d 1324, 1329 (D.C. Cir. 1995)) (internal quotation marks omitted), and therefore gave SBC the process it was due under the Fifth Amendment. More specifically, the question is whether para-

graph 56 of the merger conditions clearly placed SBC on notice that it was required to provide shared-transport service for intraLATA toll calls in the five former Ameritech states. The answer is yes.

Paragraph 56 plainly says that SBC was required to provide such service. Paragraph 56 required SBC to

> offer shared transport in the SBC/Ameritech Service Area within the Ameritech States under terms and conditions, other than rate structure and price, that are substantially similar to (or more favorable than) the most favorable terms SBC/Ameritech offers to telecommunications carriers in Texas as of August 27, 1999.

*Merger Order*, App. C ¶ 56. The parties agree that as of August 27, 1999, SBC was providing shared-transport service to two CLECs for intraLATA toll calls. From this fact, one might think it fairly straightforward to conclude that SBC was required to provide that same service throughout the Ameritech states. The condition directs the parties to look at the terms SBC was "offer[ing]" in Texas on a date certain. On that date, SBC was providing shared transport service for intraLATA toll calls. It seems to follow that SBC would be required to provide that same service in the former Ameritech states. Indeed, it is difficult to imagine how the parties could have more clearly specified the precise terms of providing shared-transport service: the same, or more favorable, terms that were in effect on a date certain between a company and its customers in a single state.

SBC's vigorous attempts to create ambiguity in these words are not persuasive. SBC argues that it was not clear that it was "offer[ing]" such service to those CLECs, because it was providing such service involuntarily, pursuant to an injunction entered by an arbitration panel of the Texas PUC. This argument is a non-starter. SBC concedes that the "term 'offer' means '[t]o present for acceptance or rejection,' or '[t]o put forward for consideration.'" SBC Reply Br. at 20 (quoting American Heritage Dictionary 863 (2d ed. 1991)). SBC did exactly that by providing two CLECs with shared-transport service for intraLATA toll calls. It does not matter

whether SBC was providing the service involuntarily. Even involuntary offers to contract are still "offers" in the ordinary sense of that word. They are "offers" because the offerees–in this case, the CLECs–have the option of voluntarily either accepting or rejecting it. This core feature of an offer does not depend on why the offeror "present[s]" it.

Another condition confirms this plain meaning of the word "offer." Paragraph 53 of the conditions is headed "Offering of UNEs." That condition provides that "SBC/Ameritech shall continue to make available ... such UNEs ... that were made available in the state under SBC's" current interconnection agreements. *Merger Order*, App. C. ¶ 53. The merger conditions call this an "offering" even though the conditions require SBC "to make available ... such UNEs." If SBC's reading of the term "offer" were correct, that heading would make no sense.

SBC's argument that the term "shared transport" in the conditions was defined to include shared-transport service only for local calls is also unpersuasive. SBC correctly points out that paragraph 55 of the conditions defined "the function of shared transport" as defined in the *Shared Transport Order*, 12 FCC Rcd 12460 (1997) (subsequent history omitted), and argues that this definition only encompassed shared-transport service for local calls. The definition of "shared transport" in that order, however, did not exclude toll service. The order dealt with "shared transport" as "defined by the Commission." *Id.* ¶ 10. At the time of the *Shared Transport Order*, the Commission defined "shared transport" as "the transmission facilities shared by more than one carrier, including the incumbent LEC, between end office switches, between end office switches and tandem switches, and between tandem switches, in the incumbent LEC's network." 47 C.F.R. § 51.319(d)(1)(ii) (1997); *see also Merger Order* ¶ 396 n.741 (defining "shared transport" the same way). That definition includes intraLATA toll shared-transport service, as intraLATA toll service uses ILECs' end office switches, tandem switches, etc. It is irrelevant that scattered passages in the *Shared Transport Order* referred to shared transport in the context of discussing the provision of local telephone

service. *See* 12 FCC Rcd 12460 ¶ 10. Regardless, it remains true that the *definition* of shared transport in that order included intraLATA toll service. For the same reason, it is also irrelevant that the Commission stated in that order that shared transport "is particularly important for stimulating initial competitive entry into the local exchange market." *Id.* ¶ 35. Paragraph 55 of the conditions establishes that the definition of "shared transport" in the order is what matters, not the purpose for which the Commission believed shared transport "particularly important."

SBC also points to paragraph 56's reference to "unbundled local switching," and claims that because the switching at issue in paragraph 56 was limited to local switching "SBC reasonably understood that the shared transport necessarily connected to that switching was likewise limited to 'local.'" SBC Br. at 30. To the contrary, this understanding is not reasonable. Paragraph 56 did not tie SBC's obligation to provide shared transport, as SBC's brief suggests, to that shared transport that was "necessarily connected" to local switching. It tied that obligation to SBC's "shared-transport" (again, as defined in the *Shared Transport Order*) offerings in Texas as of August 27, 1999. As discussed, shared-transport service for intraLATA toll service was one such offering.

Equally unavailing are SBC's attempts to overcome the clear meaning of paragraph 56 by citing affidavits from several SBC employees and a former employee of the law firm of Kellogg, Huber, Hansen, Todd, and Evans, the firm representing SBC in this matter, who were all involved in negotiating the merger conditions. SBC claims that these affidavits show that the "intent" of the parties in drafting paragraph 56 was to obligate SBC only to provide shared-transport service for local, not toll, service. As it is impossible for the individuals involved in multilateral negotiations to speak to the collective intent of all parties involved in those negotiations, however, such statements throw little light on the meaning of the actual document to which those parties collectively agreed. The best objective evidence of the collective intent of the parties in such circumstances is the ordinary

meaning of that document, and that meaning, as we have stated, is plain. The affidavits therefore fall far short of creating the ambiguity SBC seeks.

SBC further argues that subsequent FCC orders have altered its obligation in paragraph 56 to provide shared-transport for intraLATA toll service, but this argument too is incorrect. SBC's claim relies on paragraph 56's statement that SBC's obligations under the merger conditions were "[s]ubject to . . . the terms of any future Commission orders regarding the obligation to provide unbundled local switching and shared transport." *Merger Order*, App. C ¶ 56. The major premise of SBC's argument is that this language means that subsequent Commission decisions regarding ILECs' unbundling duties under the Act govern SBC's obligations under paragraph 56 of the merger conditions. The minor premise is that two subsequent Commission decisions–the UNE Remand Order and a Commission clarification of that order–have implicitly found that ILECs are not generally obligated to unbundle shared-transport service to complete intraLATA toll calls. As those orders govern the merger conditions, SBC contends, SBC is not obligated to provide shared-transport service for intraLATA toll calls, regardless of whether the merger conditions originally imposed that obligation on it.

The major premise of this argument is incorrect. The dictionary definition of "subject to," in the sense apparently meant here, is "contingent on or under the influence of some later action." Merriam Webster's Collegiate Dictionary 1172 (10th ed. 1995). As the "subject to" phrase does not specify *in what particular sense* paragraph 56 is "contingent on" those future orders, it is natural to read the "subject to" phrase simply to adopt anything in those future orders that, by the terms of such orders, contravened or altered anything in paragraph 56. For example, if the FCC issued a future order stating that "shared transport, as we defined in the *Merger Order*, excludes shared-transport service for intra-LATA toll service," then the definition of shared transport would be so modified. The future orders "condition" the merger conditions in exactly the sense any future order would

"condition" an old order: anything in the old order that is contradicted or modified by the new order is void.

SBC, nevertheless, reads into the "subject to" language the notion that future Commission orders concerning ILECs' general unbundling obligations "govern the scope of [its] shared-transport obligation." SBC Reply Br. at 11. Although SBC's reply brief denies it, this inference hinges on the assumption that "subject to" means "superseded by" or "governed by," that is, that those subsequent orders–in particular, the UNE remand order and the resulting clarification–fully specified SBC's duties under paragraph 56 of the merger conditions, regardless of what that paragraph originally required. This way of speaking defies linguistic convention. "Superseded by" means "to displace in favor of another," Merriam Webster's Collegiate Dictionary 1183 (10th ed. 1995); "governed by" means "to exert a determining or guiding influence in or over," *id.* at 504. These phrases propose a *particular way* in which those future orders could condition paragraph 56–by replacing it wholesale. That, however, is not what the paragraph says. It says that it is "subject to" future Commission orders, without specifying in what sense the future orders would condition or qualify paragraph 56. As we have discussed, that means that those particular future orders would specify the sense in which they "condition" paragraph 56. A future order, for example, could specify that "this order supersedes any and all of SBC's obligations under paragraph 56 of the merger conditions."

No future order to which SBC points, however, did any such thing. SBC points to the UNE remand order and the resulting clarification of that order, both of which we described more fully above. But those orders had nothing to do with SBC's paragraph 56 obligations under the *Merger Order*. They concerned instead SBC's unbundling obligations under the Act. They were silent on SBC's independent obligations under the *Merger Order*. Although paragraph 56 is "subject to" those orders, no command in them modified or contravened SBC's paragraph 56 obligations.

When pressed at oral argument on this natural reading of the "subject to" clause, SBC's only answer was that if this were the correct interpretation of the "subject to" language, then certain portions of paragraph 56 would be surplusage. In particular, SBC pointed to the statement that SBC

> shall continue to make [the shared-transport] offer, at a minimum, until the earlier of (i) the date the Commission issues a final order in its UNE remand proceeding . . . finding that shared transport is not required to be provided by SBC/Ameritech in the relevant geographical area, or (ii) the date of a final, non-appealable judicial decision providing that shared transport is not required to be provided by SBC/Ameritech in the relevant geographical area.

*Merger Order*, App. C ¶ 56. This argument, too, is incorrect. To the contrary, this passage imposes an independent qualification on SBC's shared-transport obligations under paragraph 56. It simply says that, if in the UNE remand proceedings, the FCC "find[s]" that, under the Act, SBC is not required to unbundle shared-transport in those states, then it is not required to do so under paragraph 56 either. That condition is independent of the "subject to" condition, because FCC unbundling orders are, again, independent of merger-condition obligations. This passage, then, made the FCC's future unbundling orders relevant to SBC's obligations under paragraph 56 in one, and only one, circumstance: if the Commission in the UNE remand order issued a "finding that shared transport is not required to be provided by SBC/Ameritech in the relevant geographical area."

Despite SBC's vigorous protestations, the UNE remand order contained no such finding. SBC's best argument to the contrary is that the UNE remand order and the subsequent clarification made clear that ILECs are not required to provide shared-transport service for intraLATA toll calls. SBC points out that the UNE remand order, as we described above, tied the obligation to unbundle shared-transport service to the obligation to unbundle switching, i.e., that ILECs must provide shared-transport service if they provide switch-

ing service. SBC then argues that because the unbundling switching obligation in the UNE remand order was limited to switching service to complete local, rather than toll, calls, the UNE remand order did not require ILECs to provide shared-transport service to complete intraLATA toll calls. The FCC interprets the UNE remand order exactly the opposite. Far from limiting ILECs' obligations to provide shared-transport service only to local service, the FCC argues that the order affirmatively required ILECs to provide such transport so CLECs may complete intraLATA toll calls.

We need not resolve which party has the better of this debate, because the UNE remand order and the clarification lack the required finding even if SBC is correct. SBC's reading of the UNE remand order shows, at most, that the obligation to provide shared transport in the UNE remand order was directed to local service. The rest of the UNE remand order, on this understanding, is silent on whether this obligation extends as well to intraLATA toll service. The same is true of the clarification order, which simply set forth a new analytical framework for analyzing ILECs' unbundling obligations generally, rather than making specific unbundling findings. These orders were therefore, we assume, both silent on whether ILECs generally are exempt from unbundling intraLATA shared-transport service for toll calls under the Act. That silence is simply not a "finding that shared transport is not required to be provided by SBC/Ameritech in the relevant geographical area." It is the absence of such a finding.

We express no view on the adequacy of the forfeiture order's interpretation of ILECs' unbundling obligations under the Act. At times, SBC's arguments read as if this is indeed the issue before us. For example, SBC suggests that the FCC in the forfeiture order interpreted its unbundling rules in arbitrary-and-capricious fashion because those interpretations are contrary to the analysis in the UNE remand order and the resulting clarification. But the rationality of the forfeiture order's unbundling analysis is not before us. The only issue is whether paragraph 56 of the merger conditions clearly put SBC on notice that it was required to provide

intraLATA toll service in the former Ameritech states. For the reasons we have stated, it did.

B. Arbitrary-and-Capricious Claim

We can much more easily dispose of SBC's second challenge–that the scale of the fine imposed by the Commission is arbitrary and capricious. As discussed, the Act makes it unlawful "willfully or repeatedly [to] fail[ ] to comply substantially with the terms and conditions of any . . . instrument or authorization issued by the Commission." 47 U.S.C. § 503(b)(1)(A). FCC regulations authorize the Commission to assess a fine of up to $120,000 for each such individual violation or each day of a continuing violation, up to a maximum fine of $1.2 million "for any single act or failure to act." 47 C.F.R. § 1.80(b)(2). Factors the Commission shall "take into account" in determining the size of the fine include "the nature, circumstances, extent, and gravity of the violation," as well as "ability to pay." 47 U.S.C. § 503(b)(2)(D).

The FCC imposed a fine of $6 million in this case because it considered SBC's refusal to provide shared-transport service to complete intraLATA toll calls five separate acts, one in each of the former Ameritech states. *Forfeiture Order* ¶ 23. It imposed the maximum $1.2 million for each such violation because SBC had failed to provide such service in each of these states beginning October 8, 2000, 12 months after the close of the merger, and continuing at least until May 14, 2001, and therefore constituted five individual continuing violations. *Id.* ¶ 26; *NAL* ¶ 21.

We hold that the FCC's application of these statutory factors to impose a fine of $6 million was reasonable. SBC argues it was not because SBC undertook to offer shared-transport service (short of offering such service to complete intraLATA toll calls) "expeditiously and in good faith consistent with its understanding of the merger conditions." SBC Br. at 36. Still, it remains true, as discussed above and as the FCC found, that SBC's failure to offer shared-transport service in five separate states violated the clear terms of the merger condition and that this noncompliance continued for

some time. The FCC was well within its discretion in finding that this recalcitrant behavior was substantial and widespread.

Similarly unavailing is SBC's complaint that the Commission's finding below that its failure to provide such service had an adverse impact on competition. Apart from competitive impact, other independent factors the FCC considered more than justify the extent of the fine. The FCC's primary reason for imposing such a large fine was the need to deter SBC, a sophisticated, profit-maximizing business whose 2001 operating revenues were nearly $46 billion, from violating the clear terms of merger conditions for which it had specifically bargained, conditions that themselves arose from the need to protect the public interest against the adverse competitive effects from the merger of SBC and Ameritech. *Forfeiture Order* ¶ 24. As discussed, a company's ability to pay is a statutory factor the FCC may consider, and it is reasonable to expect that a larger fine might be necessary to deter a large company like SBC.

The FCC also linked the amount of the forfeiture necessary to deter SBC from violating paragraph 56 of the conditions not simply to SBC's overall revenues, but also to the amount SBC stood to gain from taking that particular action. The FCC noted, specifically, that SBC benefitted by causing its competitors the inconvenience of litigating over the extent of SBC's shared-transport obligations in the five Ameritech states. *Id.* That reasoning was eminently sensible. When its competitors suffer, SBC benefits, and therefore it privately benefitted from inflicting harm on its competitors. Because the amount of deterrence necessary to prevent an action from occurring depends on both a company's revenues and the private benefit to the company of taking the action, there is a rational relationship between this factor and the seriousness of the fine the FCC imposed. The FCC may have not considered other factors relevant to that calculus, but that does not change the fact that there is a rational

relationship between these two factors and the extent of the fine.

### III.   Conclusion

For the reasons expressed above, we deny the petition for review.